UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

FB and EB, *individually and on behalf of LB*,

                                              Plaintiffs,

                         -v-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                              Defendant.

------------------------------------------------------------------X

14 Civ. 3902 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/21/15

PAUL A. ENGELMAYER, District Judge:

Plaintiffs FB and EB (the "Parents"), individually and on behalf of their minor son, LB,

bring this action against the New York City Department of Education ("DOE"), pursuant to the

Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, and Article 89 of the

New York State Education Law, N.Y. Educ. L. §§ 4401 *et seq.*

This is the second time that this case has come before the Court. The first time, the

Parents sought review of a November 25, 2011 administrative decision of the State Review

Officer (the "SRO"). The SRO (1) annulled the decision of an Impartial Hearing Officer (the

"IHO"), who had concluded that the Individualized Education Program ("IEP") developed for

LB for the 2010–2011 school year violated his right to a free appropriate public education

("FAPE"), and (2) therefore vacated the IHO's award of tuition reimbursement ($92,100) for

LB's unilateral placement at the Rebecca School during that school year. In a 2013 opinion, this

Court upheld the SRO's 2011 decision, finding no denial of a FAPE, as to the three issues that

the SRO had addressed. However, the Court noted that neither the IHO nor the SRO had

addressed the Parents' many other challenges to the IEP, despite the fact that those issues had

been briefed by both sides during the state administrative process.  The Court accordingly remanded to the SRO for consideration of those challenges.

On February 4, 2014, the SRO rendered his second decision, which again ruled for the DOE.  The Parents now appeal that decision—*i.e.*, the SRO's 2014 decision.  The parties have cross-moved for summary judgment.

For the reasons that follow, the Court concludes that the DOE denied LB a FAPE.  The Court further holds that—as the IHO originally found—the Parents' private placement of LB at the Rebecca School was appropriate and that equitable considerations favor the Parents.  The Court therefore grants the Parents' motion for summary judgment, orders the DOE to fully reimburse the Parents for the cost of private tuition, and denies the DOE's cross-motion for summary judgment.

## I.    Background

### A.    Factual Background[1]

#### 1.    LB's classification and brief educational history

Born in 2003, LB is a student classified with autism.  Pl. 56.1 ¶ 6; Def. 56.1 ¶ 1.  Autism is a "neurodevelopmental delay in relating and communicating" that is frequently associated with

---

[1] The Court's account of the underlying facts of this case is drawn from a variety of sources: (1) the Court's earlier decision, *see F.B. v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570 (S.D.N.Y. 2013) ["*FB I*"]; (2) the parties' submissions, both in connection with that earlier decision, and in support of and in opposition to the instant motion; these include plaintiffs' Local Rule 56.1 Statement of Material Facts ("Pl. 56.1"), No. 12 Civ. 1669, Dkt. 22; the affidavit of Steven Goldstein in support of the plaintiffs' motion for summary judgment ("Goldstein Aff."), No. 12 Civ. 1669, Dkt. 21, and the exhibits attached thereto; defendants' Local Rule 56.1 Statement of Material Facts ("Def. 56.1"), No. 12 Civ. 1669, Dkt. 26; and (3) the administrative record from the proceedings below and attached exhibits, including, *inter alia*, the transcript from the hearing before the IHO ("IHO Tr."), the Decision of the IHO ("IHO Dec."), the 2011 Decision of the SRO ("SRO 2011 Dec."), and the 2014 Decision of the SRO ("SRO 2014 Dec.").  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or

cognitive, physical, and sensory processing disorders.  IHO Tr. 206–07.  Sensory processing disorders relate to how information is processed by the nervous system—information that the body must interpret and organize in order to function.  *See id.*

At age two, LB presented with "significant cognitive functioning delay," including several speech- and language-related delays, some of them considered "moderate" or "moderate to severe."  Parents Ex. L1.  An occupational therapy evaluation at that time also revealed "delays in fine motor, self-help, and sensory processing skills."  *Id.*  As a result, LB has received services from New York City continuously from age two, first from the Department of Health and later from the DOE.  Pl. 56.1 ¶ 7; Def. Counter Statement ¶ 7.  These services included occupational therapy, speech and language therapy, and counseling.  Parents Ex. L1–L2.

When LB was age five, a private psychoeducational study described him as having "limited" speech, "great difficulty with language skills," and "significant" delays in his social interaction skills; as being "easily distracted by his surroundings" and unable to complete various parts of the psychoeducational examination; and as experiencing difficulties in self-regulation.  *Id.* at L2–L5.  For instance, LB is "sensitive to unpredictable loud noises" and "may become dysregulated when in proximity to a child who is crying or upset."  *Id.* at L2.  When he becomes dysregulated, LB is cognitively unavailable for learning.  During testing, for instance, when he became "overwhelmed or overstimulated," he "firmly squeezed the examiner's arm," "refused to engage" further, and "testing was discontinued."  *Id.* at L3–L4; *see also* DOE Ex. 8, at 5, 6 (psychoeducational evaluation when LB was age four noted his "significant delays in pragmatic, expressive, and receptive language which greatly impact his age appropriate social interactions";

---

documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c), (d).

his "difficulties" with fine motor skills; and that "he should be away from noise (e.g., windows, heater)").

At age five, LB began attending the Rebecca School, a private therapeutic special education school for students with neuro-developmental disorders, primarily autism. *See* IHO Tr. 215. Since fall 2008, LB has continuously attended the Rebecca School. Pl. 56.1 ¶¶ 8–9; Def. 56.1 ¶ 2. For the 2008–2009 and 2009–2010 school years, the DOE reimbursed the Parents for the tuition they paid for the Rebecca School, pursuant to settlements. Pl. 56.1 ¶ 10. The DOE and the Parents similarly entered into settlements for the 2011–2012, 2012–2013, and 2013–2014 school years—*i.e.*, the school years *after* the year at issue in this case (2010–2011). *See* Pl. 56.1 ¶ 10; Def. Counter Statement ¶ 10; Dkt. 18, at 4 n.2.

### 2.      LB's IEP for the 2010–2011 school year

On February 5, 2010, the DOE held a meeting of the Committee on Special Education ("CSE") to formulate LB's annual IEP for the 2010–2011 school year, as required by the IDEA, *see* 20 U.S.C. § 1414. Pl. 56.1 ¶ 11; Def. 56.1 ¶ 3. The CSE consisted of:  FB and EB, LB's parents; Dr. Patricia Pape, a school psychologist for the DOE; Ellen Gordon, a special education teacher who was also serving in her capacity as district representative member of the CSE; Sandra Morabito, a district parent; and Karin Robertson, LB's Rebecca School teacher at that time, who participated by telephone. Def. 56.1 ¶ 4; IHO Tr. 19; DOE Ex. 3. At the meeting, the CSE consulted a number of reports on and evaluations of LB, including: LB's 2008–2009 IEP; LB's December 2009 progress report from the Rebecca School; and a classroom observation conducted on November 6, 2009. Def. 56.1 ¶ 6; SRO 2011 Dec. 13; IHO Tr. 22–23.

The primary recommendations that emerged from the CSE meeting were that LB (1) be placed in a 12-month school-year program; (2) be placed in a special class with a 6:1:1 staffing

ratio[2] within a specialized school; and (3) receive significant related services, including five sessions per week of one-on-one occupational therapy, five sessions per week of one-on-one speech/language therapy, two sessions per week of one-on-one physical therapy, and two sessions per week of one-on-one counseling. *See* DOE Exs. 3 & 4. The 2010–2011 IEP also contained a series of annual goals; as explained below, several used terminology associated with the particular teaching methodology used at the Rebecca School (the "DIR/Floortime" methodology).[3] The IEP also noted that LB needed, *inter alia*, (1) immediate access to sensory tools (*e.g.*, pressure vest), (2) sensory breaks, (3) help with regulation, and (4) access to a quiet space to retreat to when overwhelmed. DOE Ex. 3, at 3–4. Some comments in the IEP also noted LB's "sensory issues which contribute to problems with dysregulation. He continues to present with an over-responsive sensory profile . . . ." *Id.* at 3. Finally, as is undisputed, the CSE did not conduct a functional behavior assessment ("FBA") of LB in advance of the meeting and did not develop a behavior intervention plan ("BIP") for LB. *See* Pl. 56.1 ¶ 25; Def. Counter Statement ¶ 25.

### 3. The events of February through July 2010

Shortly after the CSE meeting, the DOE sent the Parents a "Notice of Recommended Deferred Placement" form. DOE Ex. 4. The form is significant in this case. It first recapped the

---

[2] A 6:1:1 staffing ratio means that for every six students, there is one teacher and one classroom paraprofessional.

[3] "DIR" stands for the Developmental Individual-difference Relationship based approach to learning, which "proceeds from the core belief that relationships are the foundation of learning. DIR considers each child's functional emotional developmental level, how the child processes information and the learning relationships that enable him or her to progress." Parents Ex. R4. "Floortime" is "an intervention under the DIR model, looking specifically at the [child's] developmental levels." IHO Tr. 211.

essential points of the IEP and informed the Parents that the DOE intended to wait until June 2010 to select a particular placement for LB.  *Id.*  Next, the form stated:  "If you wish to visit a sample of the type of program recommended for your child, please contact Nancy Funke . . . for assistance in arranging an appointment."  *Id.*  Then, the form stated:  "You will be receiving a Final Notice of Recommendation notifying you of a specific site, on or before 6-15-10."  *Id.*  At the bottom of the page were boxes that the Parents could check to indicate that they either agreed or disagreed with the IEP recommendation, and that they either agreed or disagreed with the recommendation to defer the placement.  *Id.*

In a February 18, 2010 letter to the DOE (and to Ms. Funke specifically), the Parents wrote that they agreed with a 12-month school year for LB, but, "at the present time," they could "neither agree nor disagree with the DOE's other recommendations for L[B] because we need more information to allow us to make an informed decision."  Parents Ex. H1.  Specifically, the Parents requested "information regarding the schools at which we might be able to observe the program that the DOE recommended for L[B] and information regarding the teaching techniques and methodologies employed in these types of schools and programs."  *Id.*  The Parents also requested assistance in "setting up appointments to view various classrooms in which the recommendations that the DOE made for L[B] might be implemented."  *Id.*

The DOE did not respond to this letter.  *See* Pl. 56.1 ¶ 66; Def. Counter Statement ¶ 66.

As of June 15, 2010, the Parents had yet to receive notification of a final placement for LB.  *See* Pl. 56.1 ¶¶ 67, 69; Def. Counter Statement ¶ 69.  On June 16, 2010, the Parents sent the DOE a letter, which they faxed the same day.  *See* Parents Ex. G1–G2.  They wrote that they believed the DOE had failed to offer LB a FAPE because the DOE had (1) denied the Parents their "right to meaningfully participate in planning for his education," and (2) failed to offer LB

6

a placement that met his needs.  *Id.*  As a result, the Parents wrote, they were placing LB at the Rebecca School and would seek reimbursement.  *Id.*  The Parents did not receive a reply letter.

On June 22, 2010, the Parents received a letter, dated June 15, 2010, that notified them of LB's placement for the 2010–2011 school year, at P169M@P146M ("P.S. 169").  *See* Pl. 56.1 ¶¶ 51, 69; Def. 56.1 ¶ 13; Pl. Counter Statement ¶ 9; Def. Counter Statement ¶ 69.  As its name suggests, P.S. 169 is a public special education school housed within a larger, regular public school (P.S. 146).

The same day—June 22, 2010—LB's father, EB, wrote a reply letter to the DOE, which he faxed the same day.  "In trying to figure out whether P169M@P146M would be an appropriate school for L[B] to attend, I would appreciate it if you would help me in making an appointment to see the school as soon as possible to discuss L[B] with the school's faculty and administration."  Parents Ex. F1.  EB also requested information about, *inter alia*, LB's teachers and teaching aides at that school, the types of "teaching methodologies used in the Special Class classes at the school," and whether the DOE would provide LB with related services at the school.  *Id.*  The Parents did not receive a reply letter.

The Parents then began the process of scheduling a visit to P.S. 169.  On June 22, 2010, EB called the general number at P.S. 146; he learned that he needed to speak with the Parent Coordinator, Denise Velasquez, to schedule a visit.  Parents Ex. K1.[4]  At about 12:50 p.m. on June 22, 2010, EB left a voicemail on Ms. Velasquez's cell phone.  *Id.*  The following day, at

---

[4] In the DOE's Counter Statement, the DOE states:  "Defendants further respectfully refer the Court to Plaintiffs' own Exhibit . . . in which Plaintiff has memorialized her communications with DOE following her receipt of the FNR."  Def. Counter Statement ¶ 66.

about 1:15 p.m., EB left voicemails on both the "main" school number and Ms. Velasquez's cell phone. *Id.*

On June 24, 2010, Ms. Velasquez told EB to call back on Monday, June 28, 2010, to set up a school visit for the following week; class was not in session the week of June 28. *Id.* They spoke again on June 28, and Ms. Velasquez said she would call EB on July 1, 2010 to schedule the visit. *Id.* On July 1, 2010, they set up a visit for Friday, July 9, 2010, at 9:30 a.m. *Id.* This tour was scheduled for after the start of the 12-month, 2010–2011 school year, which appears to have begun on or about July 6, 2010. *See* Pl. 56.1 ¶ 70; Def. Counter Statement ¶ 70; IHO Tr. 481.

On July 9, 2010, the Parents, along with a social worker from the Rebecca School (Andrea Albert), visited P.S. 169. *See* Pl. 56.1 ¶ 71; Def. Counter Statement ¶ 71. However, all students were out of school that day on a field trip, so the Parents were unable to see classes in action. *See* IHO Tr. 172, 379–80, 482. They were, however, able to tour the school, see classrooms and facilities, and speak with a teacher. *See* IHO Tr. 172, 379–80, 482.

On July 20, 2010, the Parents wrote a letter to the DOE (which they faxed the same day), advising it of their concerns and reiterating their belief that the DOE had failed to provide a FAPE for LB and their intention to seek tuition reimbursement for LB's attendance at the Rebecca School during the 2010–2011 school year. *See* Parents Ex. E1. The Parents' letter noted, among other things, that they were "not sure when [LB] would be scheduled to begin attending [P.S. 169], or whether the teachers in the school would be able to employ an appropriate teaching methodology that would allow L[B] to learn." *Id.* In addition, they were "concerned that L[B]'s sensory integration and processing difficulties and related service needs

cannot be adequately or appropriately addressed at" P.S. 169. *Id.* The Parents did not receive a reply letter.

### B.    Due Process Complaint and Impartial Hearing

On October 21, 2010, the Parents filed a due process complaint, challenging the DOE's program on the grounds that: (1) the DOE had improperly refused to consider placing LB in a more restrictive program; (2) the February 5, 2010, CSE Review Team had not been duly constituted; (3) the DOE's recommendations had been improperly predetermined before the meeting; (4) the IEP that grew out of the CSE meeting was based on insufficient and/or unreliable evaluative information; (5) the IEP's proposed goals were insufficient and inappropriate; (6) the IEP's proposed goals could not be implemented in the program that the DOE recommended; (7) the IEP improperly lacked a provision for transitional support services to aid LB in the transition from the Rebecca School to the DOE's recommended program; (8) the DOE failed to conduct a FBA in advance of the meeting; (9) the DOE failed to consider whether to develop and include a BIP in the proposed IEP; (10) the DOE's recommended placement was inappropriate; (11) the CSE failed to consider whether to recommend sufficient related services for LB; and (12) the Parents were denied the right to meaningfully participate in planning for LB's education. *See* Parents' Ex. A3–A10.

An impartial hearing began on March 11, 2011, and concluded on June 10, 2011. *See* IHO Tr.; Def. 56.1 ¶ 29. At that hearing, the IHO held that the DOE had not provided LB with a FAPE. The IHO granted the Parents' request for tuition reimbursement for the 2010–2011 school year, on three grounds—that: (1) the CSE had not consulted sufficient evaluative data on which to base LB's 2010–2011 IEP (in particular, because the record did not show that the CSE had reviewed the 2009 psychoeducational update, *see* IHO Dec. 5); (2) the CSE had not

conducted a FBA and developed a BIP for LB, *see id.* at 5–6; and (3) the IEP failed to provide for parent counseling and training, *see id.* at 6. The IHO held that the Rebecca School was an appropriate unilateral placement for LB, *see id.* at 8, and that the equities favored the Parents in the matter, *see id.* at 9.

C.      **The SRO's 2011 Decision**

The DOE appealed the IHO Decision to the State Review Officer ("SRO"). The DOE primarily addressed the three points on which the IHO had relied, though in its Petition to the State Review Officer ("Petition"), the DOE also addressed the remaining issues in the Parents' due process complaint, *i.e.*, those that the IHO had not reached. *See* Petition to State Review Officer ¶¶ 39–46. The DOE further argued that the Rebecca School was not an appropriate placement for LB, *id.* ¶¶ 47–52, and that equitable considerations precluded reimbursement, most notably because the Parents "did not intend to send their child to public school," *id.* ¶ 53.

The SRO, Justyn Bates, overturned the IHO's decision. He found that: (1) the CSE based its IEP on sufficient evaluative data of LB to develop "an IEP that accurately reflected [his] special education needs," SRO 2011 Dec. 14; (2) the CSE was not required to conduct a FBA or develop a BIP because the hearing record demonstrated that LB's behavior "did not seriously interfere with instruction and could be addressed by the special education classroom teacher," *id.* at 17; and (3) the IEP's failure to include parent counseling and training did not amount to denial of a FAPE because the record reflected that "the assigned school would have provided this service," *id.* at 18. The SRO also held that the various claims the Parents had made in their due process complaint that the IHO did not address in his decision had not been preserved for his review by the Parents, because they had not cross-appealed the IHO's decision. *See id.* at 12.

D.      **This Court's 2013 Decision**

The Court found the SRO's 2011 Decision persuasive as to the three issues that both the IHO and SRO had addressed.  The Court found that these three challenges were properly noted as procedural violations, but that "they [we]re more formal than substantive," and the SRO's analysis was thorough and "merit[ed] deference."  *FB I*, 923 F. Supp. 2d at 583, 585, 586.  The Court therefore granted summary judgment for the DOE as to these three challenges, to wit, on the Parents' claims that (1) the CSE had not based the IEP on sufficient evaluative data, (2) the CSE's failure to conduct a FBA and develop a BIP denied LB a FAPE, and (3) the lack of a parent counseling and training provision in the IEP denied LB a FAPE.  *Id.* at 590.

However, the Court held, contrary to the SRO, that the Parents had indeed preserved their remaining nine challenges.  The Court held that the Parents had not been required to cross-appeal from the IHO's decision in their favor in order to preserve these separate challenges.  *Id.* at 586–89.  Accordingly, the Court denied summary judgment to both parties "on the broader issue" of whether LB had been denied a FAPE.  *Id.* at 590.  The Court stated that "judicial resolution of such claims is premature until the SRO has addressed the remaining challenges to the IEP raised before, but not addressed by, the IHO."  *Id.*

The Court therefore remanded the case to the SRO to address the Parents' remaining challenges that:

> (1) the DOE improperly refused to consider placing LB in a more restrictive program; (2) the February 2010 CSE was improperly constituted; (3) the CSE's recommendations were predetermined without parental input; (4) the goals were insufficient, inappropriate, and would not allow LB to make meaningful progress across all domains; (5) alternatively, the proposed goals could not have been implemented in the recommended program; (6) the February 2010 IEP should have included transitional support services to allow LB to move from the Rebecca School to the provided placement; (7) the assigned school was inappropriate; (8) the CSE failed to consider whether to recommend sufficient related services for LB; and (9) the parents were denied meaningful parent participation.

*Id.* at 589.  The Court added a final note:  "Without limiting the scope of the SRO's determination, the Court observes that the Parents' claims that the IEP was substantively inadequate, and that the DOE's recommended placement was not equal to the task of satisfactorily educating LB, merit close and thoughtful attention."  *Id.*

  **E.**  **The SRO's 2014 Decision on Remand**

  On February 4, 2014, the SRO rendered its second decision, ruling, across the board, against the Parents.  He found that (1) the composition of the CSE was proper; (2) the CSE's determinations had not been predetermined, and "the student's parents and special education teacher from the Rebecca School were afforded a meaningful opportunity to participate in the development of the student's IEP at the February 5, 2010 IEP," SRO 2014 Dec. 12; (3) the DOE did not need to consider more restrictive programs because it had properly assigned LB to the least restrictive program that it felt appropriate for him; (4) the IEP's goals for LB were appropriate, sufficiently measurable, and were not overly broad; (5) the failure to include transitional support services in the IEP did not "rise[] to the level of denial of a FAPE," *id.* at 15; (6) the SRO had already addressed, in its 2011 Decision, the lack of parental training in the IEP; and (7) it would be "speculative" to address any challenge to the placement school's ability to implement the IEP, as "it would be inequitable to allow the parent to acquire and rely on information that post-dates the relevant CSE meeting and IEP," *id.* 15–18.

  **F.**  **Procedural History of This Action**

  On June 2, 2014, having again exhausted the administrative process as required, the Parents filed the Complaint in this case.  Dkt. 1.

  On December 19, 2014, the Parents filed a motion for summary judgment, Dkt. 17, and a memorandum of law in support, Dkt. 19 ("Pl. SJ Br.").  On January 16, 2015, the DOE filed its

own motion for summary judgment, Dkt. 20, and a memorandum of law addressing both parties'

motions, Dkt. 21 ("DOE SJ Br.").   On February 6, 2015, the Parents filed their opposition to the

DOE's motion for summary judgment, Dkt. 22 ("Pl. Opp. Br.").   On February 27, 2015, the DOE

filed its reply to the Parents' opposition brief, Dkt. 23 ("DOE Reply Br.").

On March 13, 2015, the Court held extended argument on the motions for summary

judgment.  *See* Tr.

## II.     Applicable Legal Standards

### A.     Legal Framework

The IDEA requires a state that receives federal education funding to provide all children

with disabilities with a "free appropriate public education."   20 U.S.C. § 1412(a)(1)(A); *see also*

*Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).   A FAPE should

"emphasize[] special education and related services designed to meet [a disabled child's] unique

needs and prepare [the child] for further education, employment, and independent living."   20

U.S.C. § 1400(d)(1)(A).   To accomplish that purpose, the DOE must develop an IEP for each

disabled child that "sets out the child's present educational performance, establishes annual and

short-term objectives for improvements in that performance, and describes the specially designed

instruction and services that will enable the child to meet those objectives."   *Honig v. Doe*, 484

U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584

F.3d 412, 415 (2d Cir. 2009).   The IEP must be "reasonably calculated to enable the child to

receive educational benefits."   *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 207 (1982); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d

Cir. 2007) (citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).   It

must provide an "'appropriate education, not one that provides everything that might be thought

desirable by loving Parents.'"  *R.B. ex rel. D.B. v. N.Y. Dep't of Educ.*, 603 F. App'x 36, 38 (2d Cir. 2015) (summary order) (quoting *Walczak*, 142 F.3d at 132); *see also Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012).

New York law charges a CSE with developing an IEP for a disabled child.  N.Y. Educ. L. § 4402(1)(b)(1); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012); *Walczak*, 142 F.3d at 123.  The CSE must consist of: the Parents of the student in question; the student's regular or special education teacher; a school psychologist; a district representative "qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district"; and an additional parent representative, among others.  N.Y. Educ. L. § 4402(1)(b)(1)(a).

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may unilaterally place the child in a private school and seek reimbursement from the school district.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009); *see also M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012); *Cerra*, 427 F.3d at 192.  The parent must then file a due process complaint that challenges the appropriateness of the IEP and attend a hearing before an IHO.  N.Y. Educ. L. § 4404(1).

The U.S. Supreme Court has established a three-step reimbursement test.  Under this *Burlington–Carter* test, the DOE is required to pay for the private school tuition only if: (1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–16 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985); *see also T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363–64 (2d

Cir. 2006).  A party aggrieved by an IHO's decision may appeal to an SRO.  20 U.S.C.

§ 1415(g); N.Y. Educ. L. § 4404(2).  An appeal from the decision of an SRO may be brought as

a civil action in federal or state court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. L. § 4404(3).

### B.      Standard of Review

Summary judgment in the context of an IDEA case "involves more than looking into

disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing

administrative decisions."  *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553

F.3d 165, 171 (2d Cir. 2009)).  "In considering an IDEA claim, a district court 'must engage in

an independent review of the administrative record and make a determination based on a

preponderance of the evidence.'"  *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38

(2d Cir. 2014) (quoting *Gagliardo*, 489 F.3d at 112)).  At the same time, however, the "role of

the federal courts in reviewing state educational decisions under the IDEA is circumscribed.

Although the district court must base its decision on the preponderance of the evidence, it must

give due weight to the administrative proceedings, mindful that the judiciary generally lacks the

specialized knowledge and experience necessary to resolve persistent and difficult questions of

educational policy."  *A.C.*, 553 F.3d at 171 (citations and alterations omitted).

When the decisions of an IHO and a SRO conflict, the Court should generally defer to the

SRO's decision, as the "final decision of the state authorities," *R.E.*, 694 F.3d at 189 (quoting

*A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and

careful,'" *id.* at 184 (quoting *Walczak*, 142 F.3d at 129).  But when "the district court

appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that

deference, and in particular where the SRO rejects a more thorough and carefully considered

decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's

conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.* at 189 (quoting *M.H.*, 685 F.3d at 246). SRO and IHO decisions that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed or whether objective indications of a student's progress exist. *See M.H.*, 685 F.3d at 244.

### III.    Discussion

The Parents have narrowed their challenges on appeal. At the first step of the *Burlington–Carter* test, they now raise five arguments—two procedural and three substantive. Their procedural challenges are that the DOE (1) predetermined its recommendations prior to the CSE meeting, and (2) denied the Parents a meaningful opportunity to participate in LB's education. Their substantive challenges are that (1) the IEP was incomplete and insufficiently detailed as to LB's sensory needs, (2) the IEP failed to include transitional services for LB, and (3) the DOE's proposed placement (P.S. 169) was inappropriate because it could not have implemented the IEP. At the second step of the *Burlington–Carter* test, the Parents argue that their private placement at the Rebecca School for the 2010–2011 school year was appropriate. At the third and final step, they contend that the equities favor them, warranting full reimbursement.

The Court first addresses the Parents' procedural challenges, and then their substantive challenges.[5] It then proceeds to the second and third steps of the *Burlington–Carter* test.

---

[5] *See R.E.*, 694 F.3d at 189–90 ("In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive. At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA. Courts then examine whether the IEP

A.      **Procedural Challenges**

1.      **Preparation vs. predetermination**

The Parents' first argument is that the DOE predetermined its recommendations for the IEP.  Although the Parents make this argument only fleetingly, *see* Pl. SJ Br. 12, the Court addresses it out of comprehensiveness.

The SRO rejected the Parents' argument.  The SRO noted that the CSE may consider possible recommendations for a student, before the CSE meeting, so long as "the CSE understands that changes may occur at the CSE meeting."  SRO 2014 Dec. 11.  The SRO cited case law which aptly notes that "predetermination is not synonymous with preparation."  *Id.* (quoting *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006)).  As the Second Circuit has put the point, so long as the CSE retains "an open mind," preparation is permitted: "IDEA regulations allow school districts to engage in 'preparatory activities . . . to develop a proposal or response to a parent proposal that will be discussed at a later meeting' without affording the parents an opportunity to participate."  *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009) (quoting 34 C.F.R. §§ 300.501(b)(1) & (b)(3)).

Although the SRO's analysis of this particular challenge is brief, it is persuasive.  The SRO identified the proper, and controlling, legal principle—that preparation is not the same as predetermination.  And, in various respects, the record firmly supports the SRO's determination that, in this case, the CSE merely prepared and came to the meeting with an open mind.  First, as the SRO noted, the CSE considered multiple program structures (*e.g.*, 12:1:1 and 8:1:1), but concluded that larger structures were insufficient to meet LB's needs; instead, the CSE

_____

was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits.") (citations and internal quotation marks omitted).

recommended a 6:1:1 structure. *See* SRO 2014 Dec. 9; *see also* DOE Ex. 2 (DOE notes from CSE: "12:1:1 & 8:1:1 were rejected. Requires a smaller student-teacher ratio. We recommend 6:1:1 to meet his sensory needs and emotional needs."). Second, the record confirms that the CSE discussed, and agreed upon, a 12-month program (as opposed to, say, a 10-month program). *See* DOE Ex. 2. Third, as the SRO noted, the hearing record reflected active participation, throughout the CSE meeting, by LB's Parents and by the Rebecca School teacher who participated by phone. *See* SRO 2014 Dec. 11. Fourth and finally, the record indicates that a number of prepared, typed-out recommendations were crossed out during the CSE meeting— either because those recommendations were deemed inappropriate for LB or because LB had, in fact, already achieved those goals. *See, e.g.*, SRO Dec. 13 ("Although draft goals were typed into a draft IEP prior to the CSE meeting, the CSE made clear that the goals were in draft form and could be changed, and were in fact revised during the meeting.") (citing IHO Tr. 53–55); DOE Exs. 2 & 3 (the following typed-out lines were crossed out by hand: "decoding"—a reading skill; identifying letter-sound relationship on one-to-one correspondence, with 80% accuracy—a short-term objective; and independently reading or singing along to a motivating passage—a short-term objective); *see also* IHO Tr. 36 ("[I]f you turn to page 6-1 [of the IEP] where we have the goals, you could see that [LB] had already met one of those goals, so we crossed that out. And then there was another one in the comprehension, and we crossed that out, because he had already met that goal . . . .").

In sum, as to this challenge, the Court defers to the well-reasoned and well-supported decision of the SRO.

### 2.     The Parents' right to meaningful participation

The Parents next argue that the DOE denied their right to meaningful participation.  The crux of this argument is that the Parents have the right to participate not only at the CSE meeting, but also in the broader school-selection process—whether by providing input or at least being able to evaluate the DOE's proposed placement in a timely fashion in order to make an informed decision about whether that school can implement their child's IEP.  Factually, the Parents argue that the DOE repeatedly ignored their letters seeking information about LB's placement, notified them of the placement at the 11th hour (and days later than promised), failed to schedule a school visit until after the 2010–2011 school year had started, scheduled that visit on an inopportune day when no classes were held, and, when the Parents ultimately rejected P.S. 169, declined to offer LB an alternative placement.  Notably, the DOE does not dispute these facts.  Rather, it makes two arguments in opposition: that (1) the Parents waived the right to make this argument, and (2) the law does not provide the Parents the participatory right they claim; rather, Parents may only attend and participate at the CSE meeting.  The DOE is wrong on both points.

### i.      The DOE's claim of waiver

The DOE first argues that the Parents' reply brief was "the first time" they raised the claim of a broader participatory right that extends "beyond the CSE meeting itself."  DOE Reply Br. 4.  That claim is wrong.  Three times before, the Parents made this claim.

First was in their due process complaint.  The Parents made this claim, under a bolded, all-capital-letter heading stating, "**THE PARENTS WERE DENIED THE RIGHT TO MEANINGFULLY PARTICIPATE IN PLANNING FOR L[B]'S EDUCATION**."  Parents Ex. A10.  There, the Parents argued that: (1) "the parents were denied the right to meaningfully participate *in all stages of the IEP development and placement process*," and (2) "the district denied the parents the opportunity to have it consider their opinions and/or input and thus, denied

them the right to meaningfully participate in planning for L[B]'s education, thus resulting in a denial of a FAPE." *Id.* (emphasis added).[6]

Second, both SRO opinions, and this Court's earlier opinion, recognized that the Parents were claiming a right to participate beyond simply participating at the CSE meeting. *See FB I*, 923 F. Supp. 2d at 575; SRO 2011 Dec. 7; SRO 2014 Dec. 4.

Third, *both* parties addressed this point in their opening briefs. The Parents stated, *inter alia*, that: "[The SRO's] conclusion requires the presumption that the development of a student's IEP begins and ends with the CSE meeting. This is not correct or complete where, as here, an appropriate site placement is a substantive part of the student's program, and this aspect of the program is neither addressed nor determined during the CSE meeting. . . . The Parents' concerns about the site chosen by the DOE were, at all times, completely and utterly ignored by the DOE." Pl. SJ Br. 13. And the DOE acknowledged that this argument had been made, for the purpose of responding to it: "Plaintiffs correctly note that the IDEA provides procedural safeguards that ensure that parents are afforded the opportunity to 'participate in meetings with respect to the identification, evaluation, and educational placement of the child.' 20 U.S.C. § 1415(b)(1). However, Plaintiffs misinterpret this provision of the IDEA as contemplating that a parent is entitled to input in determining which public, or approved private school the DOE would recommend as a prospective placement for a given student." DOE SJ Br. 17.

---

[6] Other portions of the Parents' due process complaint also challenged their exclusion from the placement process. *See, e.g.*, Parents Ex. A9 ("[T]he district further denied the parents the right to meaningfully participate in planning for L[B]'s education by failing to provide them with adequate information regarding the composition of the recommended placement either during or after the February 5, 2010 CSE review meeting, notwithstanding the parents' requests to be provided with such information during the meeting and upon receiving the placement recommendation.").

The Court therefore rejects the DOE's waiver argument.  The Parents have both timely and consistently raised this claim.  *See, e.g.*, *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 223 (S.D.N.Y. 2014) (arguments are not waived if they are "either raised in the plaintiffs' Due Process Complaint or agreed to by the defendant"; court noted further exceptions that broaden the scope of review) (citing *C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014)).

> ## ii.     Did the Parents have a participatory right with respect to the proposed placement?

The Court turns next to the heart of the Parents' claim of a procedural violation of the IDEA:  Do parents' procedural rights stop the moment the CSE meeting ends?  In other words, is the DOE's "snapshot" conception of the Parent's participatory right correct?  Or do parents have a continuing participatory right—including, relevant here, to obtain timely information about, and/or to comment upon, the DOE's placement decision?  For the reasons that follow, the Court rejects the DOE's myopic conception of a right limited to participating at the CSE meeting.  The Court holds, including based on the Second Circuit's decision in *M.O. v. New York City Department of Education*, 793 F.3d 236, 244–45 (2d Cir. 2015), that parents have the right to obtain relevant information in a timely fashion about the DOE's proposed placement of their child, so as to enable them to assess and comment on that placement.

Analysis properly begins with the procedural protections afforded parents by the IDEA. As the Supreme Court has emphasized, the IDEA is solicitous of parents' participatory rights. The statute "establishes various procedural safeguards that guarantee parents both *an opportunity for meaningful input into all decisions affecting their child's education* and the right to seek review of any decisions they think inappropriate."  *Honig*, 484 U.S. at 311–12 (emphasis added); *see also Rowley*, 458 U.S. at 205 (describing IDEA's procedural protections as "giving parents and guardians *a large measure of participation at every stage* of the administrative process")

(emphasis added).  One point at which such participation is guaranteed is in the development of

the IEP.  *See, e.g.*, *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007) (reviewing

relevant provisions); *Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (same).  But the case law reflects

the IDEA's goal, more broadly, of "set[ting] up general procedural safeguards that protect the

informed involvement of parents in the development of an education for their child."

*Winkelman*, 550 U.S. at 524.

To this end, the IDEA requires that states and localities that receive federal funding

"establish and maintain procedures in accordance with this section to ensure that children with

disabilities and their parents are guaranteed procedural safeguards with respect to the provision

of a free appropriate public education by such agencies."  20 U.S.C. § 1415(a).  The statute sets

out a non-exhaustive list of these safeguards, including:

> (1) An opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the
> identification, evaluation, and educational placement of the child, and the provision
> of a free appropriate public education to such child, and to obtain an independent
> educational evaluation of the child.
> . . .
>
> (6) *An opportunity for any party to present a complaint—*
>
>> (A) with respect to any matter relating to the identification, evaluation, or
>> *educational placement of the child*, or the provision of a free appropriate public
>> education to such child . . . .

20 U.S.C. § 1415(b) (emphasis added).  As the Supreme Court has stated, "[t]he core of the

statute . . . is the cooperative process that [the IDEA] establishes between parents and schools."

*Schaffer*, 546 U.S. at 53; *see also Rowley*, 458 U.S. at 205 ("[T]he importance Congress attached

to the[] procedural safeguards [in the IDEA] cannot be gainsaid.").

Consistent with the statutory text and purpose, district courts in this Circuit have held in

several cases that parents have procedural rights that extend beyond the CSE meeting.  The most

sustained analysis is found in Judge Cote's thoughtful and persuasive decision in *C.U. v. New York City Department of Education*, 23 F. Supp. 3d 210, 225, 227–29 (S.D.N.Y. 2014).  There, after reviewing the provisions and precedents quoted above, Judge Cote explained:

> As set forth above, the Supreme Court has specifically recognized that parents have a broad right to participate in *all* decisions affecting a child's education, a right that is reflected in the breadth of the IDEA provisions cited above.  Because the procedural protections in the IDEA are intended to ensure substantive outcomes, *see Rowley*, 458 U.S. at 206, it follows that parents have a procedural right to evaluate the school assignment, *i.e.*, the right to acquire relevant and timely information as to the proposed school.

> With regard to the Student here, crucial issues going to the substantive adequacy of the FAPE could not be established at the March 2, 2011 CSE meeting because school placement had not yet been determined.  As set forth in the IEP, because of the Student's seizure disorder, any school had to have quiet place to recover from seizures and a nurse on-site to administer medication.  Thus, inasmuch as the school placement in this case raises issues that go directly to the substantive adequacy of the DOE's proposed FAPE for the Student, and inasmuch as the Supreme Court has explained that the procedural protections in the IDEA are broad and intended to ensure that parents have an opportunity to give meaningful input on all substantive issues, the Parents had at least a procedural right to inquire whether the proposed school location had the resources set forth in the IEP.

23 F. Supp. 3d at 227 (footnote omitted).  Judge Cote's analysis has been adopted by, among others, Judge Weinstein, who, in language apt here, held that "parents have a procedural right to evaluate the school assignment, *i.e.*, the right to acquire relevant and timely information as to the proposed school."  *V.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp. 3d 295, 299 (E.D.N.Y. 2014) (quoting *C.U.*, 23 F. Supp. 3d at 227); *see also id.* at 301 ("The SRO and the IHO erred by failing to consider the parent's right to meaningfully participate in the school selection process . . . .  D.S. was therefore denied her right to evaluate the child's school site when the DOE directed her to inspect a school her child would not attend."); *cf. D.C. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 510 (S.D.N.Y. 2013) ("Prior to making a placement decision, a

parent must have sufficient information about the proposed placement school's ability to implement the IEP to make an informed decision as to the school's adequacy.").

The existence of such a procedural right logically follows, too, from the Second Circuit's jurisprudence on a related issue: under what circumstances parents may challenge the substantive adequacy of the DOE's proposed placement.  The Second Circuit has held that parents may not challenge an IEP based merely on speculation that the proposed placement school, which has the resources to implement the IEP, will nevertheless fail to adhere to it.  *See R.E.*, 694 F.3d at 195. However, as the Circuit held earlier this year in *M.O.*, prospective challenges *are* permitted if they concern the "proposed placement school's *capacity* to implement a child's IEP."  793 F.3d at 244 (emphasis added).  As the Second Circuit put the point:  "School districts do not have 'carte blanche' to assign a child to a school 'that cannot satisfy the IEP's requirements.'"  *Id.* (quoting *T.Y.*, 584 F.3d at 420).  To hold otherwise, the Circuit reasoned, "would require parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP, which is 'antithetical to the IDEA'[s] reimbursement process.'"  *Id.* at 244–45 (quoting *V.S.*, 25 F. Supp. 3d at 300).

In *M.O.*, the Circuit therefore rejected the DOE's position that "a child must physically attend a proposed placement school before challenging that school's ability to implement their IEP."  *Id.* at 243.  In *M.O.*, the Second Circuit provided two helpful examples of prospective challenges to the placement school that parents *are* permitted to make: (1) "an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free," *id.* at 244 (citing *D.C.*, 950 F. Supp. 2d at 513), and (2) "an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class

occupational therapy in a group setting," *id.* (citing *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 676–79 (S.D.N.Y. 2012)).

Implicit in the Second Circuit's *M.O.* holding is that the child's parents have the right to obtain information on which to form a judgment about the proposed placement. In particular, to evaluate whether the IEP can be implemented at the proposed placement, the parents must be in position, at the time they are "actually considering [that] placement," *id.* (quoting *B.R.*, 910 F. Supp. 2d at 677), to meaningfully assess it. The substantive right recognized by the Second Circuit in *M.O.* would be of little value if parents did not have the right to obtain relevant information in time to assess the placement and, if merited, to challenge it.

The Parents here, therefore, had the procedural right to make an informed evaluation of the school placement the DOE proposed for LB. The Court next inquires whether that right was violated here.

### iii.      The DOE violated the Parents' participatory right

The SRO held that the Parents' participatory right was not violated because they "were afforded a meaningful opportunity to participate in the development of the student's IEP *at the February 5, 2010 CSE meeting*." SRO 2014 Dec. 12 (emphasis added). The SRO's analysis followed from its framing of the issue in this fashion—the SRO focused singularly on the CSE meeting. For example, the SRO noted that the Parents had been informed of the CSE meeting in advance; that they had participated at the meeting; that they had invited LB's Rebecca School teacher to the meeting; and that they "were aware they could bring whoever had knowledge or expertise of the student" to the meeting, but "chose to invite only the student's special education teacher at the Rebecca School." *Id.* at 11.

The SRO, notably, did not address the Parents' argument that the DOE violated their right to participate in post-CSE meeting events, such as the right to comment meaningfully on the DOE's proposed placement.  To be sure, in recounting the *facts*, the SRO recounted the Parents' letters bearing on this point, including their February 18, 2010 letter seeking information; their June 16, 2010 letter notifying the DOE of their intent to reenroll LB at the Rebecca School; their June 22, 2010 letter seeking additional information about P.S. 169; their July 9, 2010 visit to P.S. 169; and their July 20, 2010 letter explaining why they regarded P.S. 169 as an inadequate placement.  *Id.* at 3.  Strikingly, however, the SRO did not mention that the DOE did not respond to any of these letters.  And in his *analysis*, the SRO did not acknowledge that the crux of the Parents' claim of a procedural violation is their claim of exclusion from meaningful participation at the placement stage.

As in *C.U.*, the SRO therefore "committed legal error.  This error was one of framing, rather than application."  23 F. Supp. 3d at 227.  The Court accordingly declines to defer to the SRO's determination that the Parents' procedural rights were respected.  The Court proceeds to consider this issue itself.  It is appropriate to do so:  The relevant facts are not disputed; and the issue at hand does not call upon educational expertise, but instead is a straightforward one of proper procedure which courts are well-equipped to address.[7]

A careful review of the record here compels the conclusion that the DOE violated the Parents' participatory rights under the IDEA.  As noted, the crux of the right to meaningfully participate in the school selection process is the right is "to evaluate the school assignment, *i.e.*,

_____

[7] The Court is also mindful that more than five years have passed since the events at issue; and that this long-running dispute has been expensive and time-consuming.  Other courts presented with similar claims of procedural error have not remanded to the SRO.  *See, e.g.*, *V.S.*, 25 F. Supp. 3d at 301; *C.U.*, 23 F. Supp. 3d at 227–28.

the right to acquire relevant and timely information as to the proposed school." *V.S.*, 25 F. Supp. 3d at 299 (quoting *C.U.*, 23 F. Supp. 3d at 227).  Regrettably, the record here reveals a series of lapses by the DOE that, in practice, impaired the Parents' ability to so participate.  The following timeline, highlighting key moments, is revealing:

1. **February 5, 2010**:  The CSE convened.  Shortly after the CSE meeting, the DOE sent a form to the Parents, informing them that the DOE intended to wait until June 2010 to select a particular placement for LB.  The form said:  "You will be receiving a Final Notice of Recommendation notifying you of a specific site, on or before 6-15-10."  The form added: "If you wish to visit a sample of the type of program recommended for your child, please contact Nancy Funke . . . for assistance in arranging an appointment."

2. **February 18, 2010**:  The Parents wrote a letter to the DOE (and to Ms. Funke specifically), requesting information about (1) schools where they could "observe the program that the DOE recommended for L[B]," and (2) the teaching methodologies used at these types of schools.  The Parents also requested assistance in "setting up appointments to view various classrooms in which the recommendations that the DOE made for L[B] might be implemented."  The DOE did not respond to this letter.

3. **June 15, 2010**:  Contrary to the DOE's representation in February, the Parents had yet to receive a final notice of recommendation.

4. **June 16, 2010**:  The Parents wrote, in a letter to the DOE (which they faxed the same day), that they believed the DOE had failed to offer LB a FAPE because the DOE had (1) denied their right to meaningfully participate in planning for LB's education, and (2) failed to offer LB a placement that met his needs.  As a result, the Parents were placing LB at the Rebecca School and would seek reimbursement.  The DOE did not respond to this letter.

5. **June 18, 2010**:  This was the Parents' deadline to reenroll LB at the Rebecca School.

6. **June 22, 2010**:  The Parents received the DOE's proposed placement, dated June 15, 2010, at P.S. 169.

7. **June 22, 2010**:  The Parents wrote, in a letter to the DOE (which they faxed the same day), that they sought assistance "in making an appointment to see the school as soon as possible to discuss L[B] with the school's faculty and administration."  They also requested information about LB's teachers and teaching aides, the types of "teaching methodologies used in the Special Class

classes at the school," and whether the DOE would provide LB with related services at the school. The DOE did not respond to this letter.

8. **June 22, 2010**: The Parents left a voicemail, at about 12:50 p.m., with P.S. 169's Parent Coordinator, Denise Velasquez, seeking to schedule a visit.

9. **June 23, 2010**: The Parents left further voicemails, at about 1:15 p.m., on both the "main" school number and Ms. Velasquez's cell phone.

10. **June 24, 2010**: Ms. Velasquez told the Parents to call back on Monday, June 28, 2010, in order to set up a school visit for the week after that; class was not in session the week of June 28.

11. **June 28, 2010**: Ms. Velasquez said she would call the Parents on July 1, 2010 to schedule the visit.

12. **July 1, 2010**: The Parents arranged a visit to P.S. 169 for Friday, July 9, 2010, at 9:30 a.m.

13. **July 6, 2010**: The 2010–2011 school-year began at P.S. 169.

14. **July 9, 2010**: The Parents, along with a social worker from the Rebecca School, visited P.S. 169. However, all of the students were out of school that day on a field trip, and so the Parents were unable to see classes in progress. The Parents also were not told definitively who LB's teacher would be.

15. **July 20, 2010**: The Parents wrote, in a letter to the DOE (which they faxed the same day), that they believed the DOE had failed to provide a FAPE for LB, and they intended to seek tuition reimbursement for LB's attendance at the Rebecca School during the 2010–2011 school year. They raised a series of concerns about P.S. 169. The DOE did not respond to this letter.

Five features of this chronology are worth highlighting.

*First*, the DOE determined to wait until June, after a February CSE, to recommend a placement for LB.

*Second*, the Parents wrote the DOE four times, twice attempting to take the DOE up on its offer to arrange for a school visit, but the DOE—which does not dispute receiving these letters—inexplicably did not respond to them. These included the letters of February 18 and June 22,

2010, which requested assistance arranging visits and information about teachers and teaching methodologies.

*Third*, the information the Parents sought was directly relevant to their ability to assess the proposed placement and its capacity to implement LB's IEP. For example, the IEP required that the school provide LB with immediate access to sensory materials, and set out goals that drew upon (and used the terminology of) a particular teaching methodology (that used at the Rebecca School—DIR/Floortime). The Parents understandably sought to assess whether a proposed placement school could implement those aspects of the IEP. Did it have the requisite sensory materials? Did its teachers have background in teaching using the methodology referenced in the IEP? *Compare M.O.*, 793 F.3d at 244.

*Fourth*, June 18 was the deadline to reenroll LB at the Rebecca School. As of that key date, the Parents had not been notified of a proposed placement; the DOE had gone radio silent for four months; and the Parents lacked any tangible ability to assess whether a proposed placement would be appropriate for LB's needs. The Parents, at this point, had little choice but to enroll him at the Rebecca School. At LB's age, education was compulsory. *See* N.Y. Educ. L. § 3205(1)(a). To the Parents' credit, in the contract they signed with the Rebecca School in June, *see* Parents Ex. Q, there was an "escape" clause: If the Parents received a public placement and wanted to send LB there, they could pull LB out of the Rebecca School until September 7, 2010, and they would lose only their deposit ($1,000), not the full annual tuition ($92,100), *see id.* ¶ 4(a).

*Fifth*, the Parents were not at fault. They consistently acted swiftly and conscientiously. They wrote to the DOE in February when they received the notice of deferral; they wrote to the DOE on June 22, the day they received the proposed placement; and, throughout late June, they

repeatedly contacted Ms. Velasquez to schedule a school visit.  In contrast, the DOE persistently

was non-responsive, or dismayingly slow to respond.  After the Parents contacted Ms. Velasquez

on June 24, 2010, and again on June 28, 2010, she told the Parents to call back four days later;

ultimately, she scheduled a school visit for July 9, 2010.  That was precious time.  During the

two-and-a-half weeks between June 22 and July 9, 2010, the new school year had begun.  And

on the July 9 visit, representatives of P.S. 169 were unable to tell the Parents who LB's teacher

would be; and the visit was of limited utility to the Parents because no classes were in session—

all students were out of school on a field trip.[8]

Pressed at argument, the DOE's counsel conceded that, on review of the facts, "it does

feel like rough treatment" of the Parents by the DOE.  Tr. 51.  But the DOE's counsel argued that

the Parents have no viable claim, because they had unilaterally rejected the IEP *before* they even

received the DOE's public placement—thus, counsel argued, the ensuing events were irrelevant.

Tr. 50–51.  But that is unpersuasive:  The Parents' reason for rejecting the IEP, and enrolling LB

in the Rebecca School, was that the IEP could not be meaningfully evaluated independent of the

proposed placement's ability to implement it.  *See, e.g.*, *C.U.*, 23 F. Supp. 3d at 227.  The DOE

had not communicated that placement to the Parents as of the deadline for enrollment at the

Rebecca School.  *See, e.g.*, IHO Dec. 9.  Viewing their actions differently, the Parents did not

reject the IEP so much as they selected the only option before them as of that date.  And once

---

[8] When asked why she had scheduled the Parents' visit for a day when all the students were out,
Ms. Velasquez testified that, "The only way that would have occurred is that if I had mixed up
my days for the trips, which I believe was the case."  IHO Tr. 188.

they did learn of LB's proposed placement, the Parents promptly and repeatedly told the DOE

that they wanted to closely consider that option.[9]

      Judge Cote's analysis in *C.U.*, involving a similar unresponsiveness by the DOE in the

face of efforts by parents to evaluate a proposed placement, again provides helpful guidance.

She wrote:

> [T]he DOE provided an FNR [a Final Notice of Recommendation with a proposed
> school placement] on June 18, just days before the 2011–2012 school year began
> for the Student on July 5.  Notably, the DOE had previously promised that the FNR
> would be received no later than June 15.  The FNR stated that, if the DOE did not
> hear from the Parents by June 28, the proposed recommendation would be put into
> place.  Upon the Parents' return from vacation on June 27, they immediately and
> diligently set about attempting to contact the recommended school.  They were
> unable to leave a message with the school, possibly because it was changing its
> voicemail software.  Their challenges in reaching the recommended school were
> documented in letters they wrote and faxed to the CSE explaining their problems.
> The CSE did not respond to any of these letters.  Having been unable to arrange a
> visit to Horan [the proposed placement] or to inquire about its facilities or
> programs, the Parents enrolled the Student [at the] Rebecca [School] on July 5.
> These delays and lack of response by the DOE violated the Parents' procedural
> right to evaluate the school placement so that they could make an informed decision
> about the child's school. Because this violation significantly impeded the Parents'
> opportunity to participate in the decision making process concerning the provision
> of the FAPE, this procedural violation constitutes a denial of a FAPE and satisfies
> the first element of the *Burlington–Carter* test.

---

[9] The DOE briefly tries to frame the inquiry as whether Parents have a right to provide "input" in
determining the school placement for their child.  DOE SJ Br. 17.  And the Parents do claim also
to have sought that.  But the record predominantly reflects, and their claims predominantly
concern, their efforts—from winter through early summer of 2010—to get *information* (*e.g.*,
about the options being considered for LB, teachers and their methodologies, and the availability
of related services).  And, before this Court, the parties do not dispute that the DOE has the
ultimate authority to propose a school placement. *See, e.g.*, Tr. 11–12, 17, 33–34.  The violation
of the Parents' right to timely information to assess the propriety of a proposed placement is the
sole basis of the Court's ruling here.  *Accord C.U.*, 23 F. Supp. 3d at 229 ("[T]o the extent that
the IHO recognized a 'right to visit' a school placement, and the SRO and DOE dispute the
existence of such a right, it is not necessary to reach that specific issue to conclude that the
Parents' procedural right to evaluate a school placement was violated here" due to the DOE's
failure to provide relevant information in a timely fashion.).

*C.U.*, 23 F. Supp. 3d at 227–28.  Like C.U.'s parents, LB's were promised an FNR by June 15,

but that promise went unmet; made good-faith attempts to acquire relevant information given the

impending start of the new school year; but were inexplicably unable to secure information, or

even responsiveness, by the DOE.  Indeed, here, the DOE had significantly more time to provide

the Parents with the information sought, making this case, if anything, a stronger candidate for

finding a procedural violation.

In sum, a parent's IDEA right to meaningfully participate means, at a minimum, the right

to obtain *relevant* and *timely* information as to the proposed school.  *V.S.*, 25 F. Supp. 3d at 299;

*C.U.*, 23 F. Supp. 3d at 227.  LB's Parents received neither.  This violation denied LB a FAPE.

*See, e.g.*, *V.S.*, 25 F. Supp. 3d at 301; *C.U.*, 23 F. Supp. 3d at 227–28; *see generally R.E.*, 694

F.3d at 189–90 (procedural violations constitute a denial of a FAPE if they "impeded the child's

right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the

decisionmaking process," or "caused a deprivation of educational benefits") (quoting 20 U.S.C.

§ 1415(f)(3)(E)(ii)).

Having found that the DOE denied LB a FAPE, the Court will need to address

subsequent steps of the *Burlington–Carter* test.  First, however, the Court turns to the Parents'

substantive challenges.

### B.     Substantive Challenges

#### 1.     Whether the IEP was sufficiently detailed as to LB's sensory needs

The Parents' first substantive challenge is that the IEP did not describe, with sufficient

detail, LB's sensory processing deficits and his behavior management needs.  *See* Pl. SJ Br. 14.

The Parents argue that, although the IEP generally noted LB's sensory needs, it failed to address

the following crucial points: (1) LB's "visual processing sensitivities," and especially his

32

sensitivity to fluorescent lighting, which could trigger episodes of dysregulation; (2) "what kind of sensory strategies L[B] needed to maintain or regain sensory regulation, such as deep proprioceptive input, the motion of swinging or the release of jumping on a trampoline—all strategies that had been successful at Rebecca"; and (3) the fact that LB's sensory needs were "constant and needed to be addressed via the provision of a 'sensory diet.'" Pl. SJ Br. 14–15; Pl. Opp. Br. 11.

The DOE responds that these allegations do not appear in the Parents' due process complaint and that the Parents thereby waived this challenge. DOE Reply Br. 10. Alternatively, the DOE contends that the IEP adequately documented LB's sensory processing issues and behavior management needs. DOE Reply Br. 11. For instance, it argues, in the "Social/Emotional Management Needs" section, the IEP states, "Immediate access to sensory materials (e.g., pressure vest)" and "Access to a quiet space to retreat to when overwhelmed"; and in the "Academic Management Needs" section, the IEP states that LB needs "sensory tools . . . sensory breaks . . . visual and verbal support . . . redirection . . . help with regulation." *Id.* (citing DOE Ex. 3, at 3–4).

The Court agrees with the DOE that the Parents waived this challenge. The Parents did argue before the SRO that "the IEP goals were insufficient and inappropriate because they fail to address the student's educational needs, the goals are overly broad, and the short-term objectives lack objectively measurable criteria." SRO 2014 Dec. 13 (citing Parents' due process complaint, at 6–7). In his 2014 Decision, the SRO responded to this claim, in a section entitled "IEP Goals and Short-Term Objectives." He noted that the annual goals set in the IEP were broad-ranging and were designed to address LB's specific needs; that "[t]he goals of the Rebecca School were incorporated since they knew the student"; and that the IEP's short-term objectives provided

"appropriate measurable evaluative criteria." *Id.* at 13–14.  The Parents, however, now challenge the IEP on the grounds that its early portions—which describe LB's present performance, academic management needs, and behavioral needs, *see generally* DOE Ex. 3—fail to include sufficient detail.

With respect to the DOE's argument that the Parents waived the right to make such a claim, the IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B).  As a result, "district courts in this Circuit have typically held that the scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' Due Process Complaint or agreed to by the defendant." *C.U.*, 23 F. Supp. 3d at 223.  But "the waiver rule is not to be mechanically applied." *C.F.*, 746 F.3d at 78.  As the Second Circuit has recently explained, "[t]he key to the due process procedures is fair notice and preventing parents from sandbagging the school district by raising claims after the expiration of the resolution period." *Id.* (citation and internal quotation marks omitted).  The Second Circuit further noted that the "IDEA itself contemplates some flexibility," and does not require "that alleged deficiencies be detailed in any formulaic manner" and that "the waiver rule limits only what may be raised at the due process hearing." *Id.* (citations and internal quotation marks omitted).  Applying this holding in *C.F.*, the Second Circuit held that arguments not directly raised in a due process complaint were not foreclosed because (1) that complaint "provided fair notice to the [DOE] of" the argument at issue; (2) "both the IHO and SRO reached the issue on the merits, giving [the federal court] a record for review"; or (3) the argument goes to "the heart of this dispute." *Id.*; *see also C.U.*, 23 F. Supp. 3d at 223–24.

34

The opposite outcome is required here.  For three reasons, even under *C.F.*'s "more plaintiff-friendly standard," the Parents' claim that the IEP did not adequately describe LB's sensory processing deficits and behavior management needs was not preserved.  *C.U.*, 23 F. Supp. 3d at 224.

First, nothing in the Parents' due process complaint "would [have] put DOE on notice that the Parents were making an independent [substantive] challenge to the" IEP along these lines.  *Id.*  That complaint recited 12 separate challenges, each under a separate header.  *See* SRO 2011 Dec. 7; *FB I*, 923 F. Supp. 2d at 575.  Both the SRO and this Court (in its prior decision) set out these challenges; neither perceived the challenge that the Parents now raise.  *See* SRO 2011 Dec. 7; *FB I*, 923 F. Supp. 2d at 575.  The only challenge that comes close is that "the annual goals and short-term objectives set forth in the February 5, 2010 IEP cannot appropriately address any and/or all of L[B]'s educational weaknesses and deficits," including the manifestations of his disability.  Parents Ex. A6.  This challenge continues by arguing that the annual goals "lack adequately objectively measurable criteria"; that certain annual goals were "so broad" that they did not provide meaningful guidance; and that most of the short-term objectives "do not contain target dates for completion" and therefore do not provide appropriate guidance to LB's teachers.  *Id.* at A7.  But that is a different challenge than the one the Parents now seek to raise.[10]  And the Parents' current claim is not even about the IEP's goals, which are *forward*-looking; rather, their current challenge is that the IEP did not properly describe LB's *present* needs or the strategies that had *previously* been successful at the Rebecca School.  For

---

[10] To be sure, the "Relevant Facts" section of the complaint describes LB as needing "a sensory diet, access to appropriate sensory regulating devices, and access to a sensory gymnasium, in order to make educational progress."  *Id.* at A2.  But describing a student in the facts section is quite different from raising a legal challenge, which would be expected in the argument section.

these reasons, the Parents' due process complaint did not put the DOE on fair notice of this challenge.

Second, neither the IHO nor SRO reached this issue on the merits. *See C.F.*, 746 F.3d at 78; *see also C.U.*, 23 F. Supp. 3d at 223–24. That matters: Courts should not, in the first instance, address sensitive questions of educational policy. *See, e.g.*, *T.P.*, 554 F.3d at 254.

And third, this challenge does not go to "the heart of this dispute." *C.F.*, 746 F.3d at 78. Although LB's sensory processing deficits are central to his disability, the heart of this dispute involves whether the Parents received a meaningful opportunity to evaluate the DOE's proposed placement. That issue is not implicated by whether the description of his present sensory deficits in the IEP was, or was not, adequate.

Accordingly, the Court agrees with the DOE that the Parents have waived this challenge, and that the SRO was justified in not addressing it.

### 2.    Transitional support services

The Parents next argue that the IEP was substantively deficient because it failed to provide for transitional support services for LB. *See* Pl. Opp. Br. 11 ("[T]he IEP did not . . . provide him with needed transition support services."); Pl. SJ Br. 15 ("The IEP also failed to account for how L[B] might react to a new and different school environment, in the care of unfamiliar adults . . . ."). The DOE counters that there is no requirement that an IEP include a transition plan, and that no case has found denial of a FAPE based on the absence of transitional support services in the IEP of a student transferring from an 8:1:3 classroom in a private school to a 6:1:1 special classroom. *See* DOE Reply Br. 12–13.

The SRO considered, and rejected, this challenge. SRO 2014 Dec. 14–15. The SRO began, appropriately, by noting that New York regulations define transitional support services as

"temporary services, specified in a student's [IEP], provided to a regular or special education teacher to aid in the provision of appropriate services to a student with a disability transferring to a regular program or to a program or service in a less restrictive environment." *Id.* at 14 (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ddd)).  Relying on that definition, the case law, and the fact that the DOE's proposed placement for LB was "highly structured," the SRO rejected the Parents' challenge. *Id.* at 15.  The SRO acknowledged that "it would not have been inappropriate for transitional support services to be included on the IEP as a supportive service if the CSE believed it was needed." *Id.*  But, he noted, the IEP required a number of services and accommodations, aimed at addressing LB's sensory needs. *Id.*  Viewing the IEP as a whole, the SRO found, any failure to include transitional support services did not rise to the level of a denial of a FAPE. *Id.*

Because this component of the IEP reflects a sensitive educational judgment about how best to effectuate the transition of an autistic student, deference is due to the SRO's decision.[11] *See, e.g.*, *A.L. v. N.Y.C. Dep't of Educ.*, 812 F. Supp. 2d 492, 505 (S.D.N.Y. 2011) ("[D]istrict courts must show deference to administrative experts on 'a difficult question of educational policy: how best to transition an autistic child . . . .'") (quoting *T.P.*, 554 F.3d at 254).  Moreover, the case law supports the SRO's conclusion:  Courts, applying the New York regulation cited by the SRO, have noted that it defines transitional support services as being *for the teacher*, and consistently have held that the IDEA does not require transitional support services *for the student*. *See, e.g.*, *R.E.*, 694 F.3d at 195 ("[The student's] parents also challenge the IEP's lack

---

[11] At the same time, the record does reflect that LB is most comfortable with "trusted adults" and "preferred adults," suggesting that a transition to a new environment would likely have been challenging. *See* Parents Ex. N1–N2; *see also* DOE Ex. 8, at 2; IHO Tr. 265.

of a transition plan, but they have not identified any legal requirement that an IEP contain a transition plan, nor have they articulated why the absence of such a plan was so significant as to deny [the student] a FAPE."); *M.L. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 2314 (RRM) (LB), 2015 WL 1439698, at *10 (E.D.N.Y. Mar. 27, 2015) ("The parents do not identify a legal basis for their insistence that the DOE was required to provide M.L. with a transition plan, nor could they, because there is no such requirement under the IDEA."); *id.* (noting that, under N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ddd), transitional support services "are provided to the teacher, not the student"); *F.L. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 5131 (RKE), 2012 WL 4891748, at *9 (S.D.N.Y. Oct. 16, 2012) (noting absence from statute of entitlement to a transition plan in a student's IEP), *aff'd*, 553 F. App'x 2 (2d Cir. 2014); *A.L.*, 812 F. Supp. 2d at 505 ("The Court agrees with Defendants that there is no requirement that an IEP specify a transition plan for a student attending a new school placement.").

For these reasons, the Court upholds the SRO's determination that the failure to specify a transition plan for LB did not deny him a FAPE.

### 3.      Whether the proposed placement, P.S. 169, could implement the IEP

The Parents' final substantive challenge is to the DOE's proposed placement, P.S. 169. They argue that this placement could not have implemented the IEP for reasons including the limited availability of P.S. 169's occupational therapist and speech/language therapist. *See* Pl. SJ Br. 18–24. The DOE responds that such claims are "impermissibly speculative," because "[t]he DOE is not required to defend the capabilities of a placement school to implement an IEP when a student never attends that school." DOE SJ Br. 24. In the alternative, the DOE argues that P.S. 169 was appropriate for LB. *Id.* at 27–29.

In its 2013 opinion, the Court flagged this issue as important for the SRO to address on remand:  "Without limiting the scope of the SRO's determination, the Court observes that the Parents' claims that the IEP was substantively inadequate, and that the DOE's recommended placement was not equal to the task of satisfactorily educating LB, merit close and thoughtful attention."  *FB I*, 923 F. Supp. 2d at 589.

In his 2014 decision, however, the SRO largely declined to reach the issue.  SRO 2014 Dec. 15–18.  He stated that, after a parent consents to a public placement, the DOE must *then* implement the required services "in conformity with the student's IEP."  *Id.* at 16.  But, the SRO stated, challenges to the recommended placement are "speculative when the student never attended" that school.  *Id.*  Canvassing Second Circuit law, the SRO noted that *R.E.* forbids parent challenges based on "speculation that the school district will not adequately *adhere* to the IEP," *id.* (quoting *R.E.*, 694 F.3d at 195) (emphasis added), whereas *T.Y.* forbids the DOE from recommending a placement that cannot *implement* the IEP, *id.* at 17 n.2 (citing *T.Y.*, 584 F.3d at 420).  The SRO then noted that several district courts have construed *R.E.* and *T.Y.* so as to permit prospective challenges to a placement (*i.e.*, made before the student attends the recommended school) based on that school's inability to implement the IEP.  *Id.* at 17.  However, the SRO "depart[ed] from those cases."  *Id.*  It would be "inequitable," he reasoned, to permit the parents "to acquire and rely on information that post-dates the relevant CSE meeting and IEP . . . while at the same time confining a school district's case to" the services set forth in the IEP.  *Id.*  Therefore, the SRO held, the Parents' arguments were "speculative" and the DOE "was not required to establish that the assigned school would have been appropriate upon the implementation of his IEP."  *Id.*

After devoting six paragraphs to explaining why the Parents' arguments were required to be terminated at the threshold as impermissibly speculative, the SRO addressed two sentences to the substantive appropriateness of P.S. 169. He stated that, based on "the available evidence in the hearing record," including the testimony of LB's would-be teacher at P.S. 169, "the special class at the assigned public district school would have been able to implement the goals on the student's February 5, 2010 IEP and otherwise met the student's unique needs to enable him to receive educational benefit." *Id.* at 18.

The SRO's decision merits no deference. First, he misapplied the law, wrongly holding that *R.E.* (involving non-adherence to an IEP) was controlling even though the challenge here implicates *T.Y.* (inability to implement an IEP). Notably, following the SRO's decision, the Second Circuit has reiterated that prospective challenges by parents *are* permitted where they concern the "proposed placement school's *capacity* to implement a child's IEP." *M.O.*, 793 F.3d at 244 (emphasis added). School districts may not assign a child to a school "that cannot satisfy the IEP's requirements." *Id.* (quoting *T.Y.*, 584 F.3d at 420). That has consistently been the Parents' claim here. *See* Parents Ex. A7 (due process complaint) ("**ALTERNATIVELY, THE PROPOSED GOALS CANNOT BE IMPLEMENTED IN THE RECOMMENDED PROGRAM**"); *id.* at A9 (arguing that P.S. 169 could not provide LB with appropriate academic guidance or sufficient related services to address his educational needs and his IEP-mandated goals); *see also FB I*, 923 F. Supp. 2d at 589.

Second, the SRO's two-sentence discussion of the appropriateness of P.S. 169 is too cursory to merit deference. It does not reveal genuine engagement with the Parents' claim. One sentence states, summarily, that: "the special class at the assigned public district school would have been able to implement the goals on the student's February 5, 2010 IEP and otherwise met

40

the student's unique needs to enable him to receive educational benefit." *Id.* at 18.  Courts do

not defer to such "conclusory assertions." *B.R.*, 910 F. Supp. 2d at 678 (citing *M.H.*, 685 F.3d at

246); *see also M.H.*, 685 F.3d at 241 ("The SRO's or IHO's factual findings must be 'reasoned

and supported by the record' to warrant deference.") (quoting *Gagliardo*, 489 F.3d at 114).  The

other sentence mentions the testimony of LB's would-be teacher at P.S. 169.  But, beyond citing

the testimony, the SRO declined to explain substantively why it was persuasive and responsive

to the Parents' concerns.  The SRO was, tellingly, silent about others' contrary testimony.

Turning to the merits, the Parents argue that P.S. 169 could not have implemented the

IEP, and was an inappropriate placement for LB, for four reasons: (1) the IEP used a teaching

methodology—DIR/Floortime—in which the teachers at P.S. 169 were not trained; they

therefore could not have implemented the IEP; (2) P.S. 169's relevant therapists—including the

speech/language therapist and the occupational therapist—were only at the school two days a

week, but LB's IEP required five sessions of each type of therapy per week, which would have

required him to have received multiple sessions on the days the therapists were present; (3) the

school's environment (*e.g.*, noise, light, temperature) would have "set him off"—specifically, the

loud intercom announcement and school bells, the fluorescent lighting, and the hot, un-air-

conditioned hallways and OT/PT room; and (4) the school lacked appropriate facilities and

equipment to help LB maintain sensory regulation, or to regain calm after becoming

dysregulated.  *See* Pl. SJ Br. 18–24.  The DOE counters that the testimony of P.S. 169 teacher

Stephanie Silverman reveals that the school would have met LB's academic needs, managed his

emotional needs, and furnished him relevant services.  DOE SJ Br. 28.  The DOE argues that

"Plaintiffs fail to demonstrate in any way how P-169 would have been unable to implement the

goals of the 2010 IEP." *Id.*  Instead, the DOE states, the Parents' position (and their witnesses'

testimony) amounts to a preference for the Rebecca School and its teaching methodology.  *Id.* at 29.

The record decisively supports the Parents' critique.

First, as to teaching methodology, the DOE wrongly accuses the Parents as unjustifiably advocating for the Rebecca School's teaching methodology, DIR/Floortime.  In fact, it is *the IEP* that adopts that methodology.  That is unsurprising; as the SRO explained, "[t]he goals related to academics were developed with input from the student's Rebecca School special education teacher.  The goals of the Rebecca School were incorporated since they knew the student."  SRO 2014 Dec. 13 (citing IHO Tr. 35–36 (testimony of Dr. Pape)).  Specifically, four of the IEP's 17 goals overtly use DIR/Floortime terminology.  *See* DOE Ex. 3, at 9 ("L[B] will strengthen his ability to share attention in order to enter into a continuous flow of communication."); *id.* ("L[B] will increase his ability to enter into two-way purposeful communication."); *id.* ("L[B] will improve sensory processing and regulation needed for appropriate two-way purposeful interactions."); *id.* at 12 ("L[B] will improve his engagement/pragmatic language skills for a pleasurable back and forth flow of communication.").  A number of the "short-term objectives" also do so:  Five, for instance, use the phrase "circles of communication," and specify the number of circles LB should be able to engage in, open, and close—sometimes with adults, sometimes with a peer—in a particular amount of time.[12]  Multiple witnesses testified that this

---

[12] *See, e.g.*, *id.* at 9 ("L[B] will close five to ten circles of communication with the art therapy intern surrounding an art experience in a 30-minute session."); *id.* ("L[B] will open three to five circles of communication with the art therapy intern in a 30-minute session."); *id.* ("L[B] will engage in a shared art experience with a peer for three circles of communication in a 30-minute session with maximum support."); *id.* ("During a sensorimotor activity in the sensory gym, L[B] will engage with the therapist in a continuous flow and open and close 30+ circles of communication with minimal prompting."); *id.* at 13 ("L[B] will engage in a verbal continuous flow, for up to 30 circles of communication.").

terminology is specific to DIR.  *See, e.g.*, IHO Tr. 288 ("[A]nything that talks about continuous flow of communication, back and forth communication, two-way purposeful communication, all of those are terms very specifically out of the DIR model.  It is part of the description of the developmental levels, and it is part of the description of interventions used within that model."); IHO Tr. 145–48; IHO Tr. 383–84.  Thus, when the CSE chose these specific goals—and it did so unanimously, according to Dr. Pape, *see* IHO Tr. 42, 46—it embraced a particular educational methodology.  The CSE therefore implicitly intended that LB receive instruction from teachers in position to implement this approach.

Revealingly, the teacher whom the DOE represents would have taught LB at P.S. 169, Stephanie Silverman, acknowledged that she neither understood nor could have implemented these goals.  Silverman testified that she was not trained in DIR/Floortime, *see* IHO Tr. 148; that she was unfamiliar with the term "circle of communication," *see* IHO Tr. 145; and that goals relating to "sharing attention" and "entering into a continuous flow of communication" were "not the kind of language that I use in my classroom," IHO Tr. 148.  Asked by the DOE's counsel whether she could "implement the goals" on a page of the IEP with several goals sounding in DIR/Floortime, she answered:  "A lot of the stuff [in the IEP] is really not stuff that we do in the classroom."  IHO Tr. 158–59.  Nor were any other teachers at P.S. 169 trained in DIR/Floortime.  *See* IHO Tr. 176–77, 190.  The conclusion is inescapable—and the DOE offers nothing to counter it—that, at least as to four of the IEP's 17 goals, P.S. 169 was simply incapable of implementing them.

Second, the IEP mandated that LB receive significant related services, including five sessions per week of one-on-one occupational therapy, five sessions per week of one-on-one speech/language therapy, two sessions per week of one-on-one physical therapy, and two

43

sessions per week of one-on-one counseling.  *See* DOE Exs. 3 & 4.  But the occupational

therapist and speech/language therapist were only at P.S. 169 two days per week.  *See* IHO Tr.

391, 483.  As a result, LB would have had multiple sessions of the same therapy, two or three on

the same day, in order to fulfill the IEP's mandate.  *See* IHO Tr. 391, 483.  The record reflects

that there is a meaningful difference between daily therapy and therapy only two days a week.

For example, LB's occupational therapy "kind of anchors the day and really sets [LB] up for

regulating himself throughout the day."  IHO Tr. 486.  The DOE presented no evidence that LB

would have been able to benefit from two-days-a-week therapy, let alone evidence as to how he

would have adapted to longer sessions, multiple daily sessions, or days without therapy, or

whether his attention span would have permitted longer or twice-a-day therapy regimens.  The

record casts doubt on this:  It reflects, for instance, that LB experienced difficulties with

attention-span and that 30 minutes was the longest period when he could sustain attention.  *See,*

*e.g.*, Parents Ex. O2 ("When engaged in a preferred activity . . . , L[B] is able to stay calm and

engaged for up to 30 minutes in a 1:1 interaction with a co-regulating adult who works hard to

bring him back into an interaction when he becomes distracted."); Parents Ex. L3 (LB was

"easily distracted by his surroundings").

      The locations at which related services were provided at P.S. 169 exacerbate these

concerns.  Occupational therapy was sometimes provided in an office at the same time as

sessions for other students, and other times provided in the hallway, *see* IHO Tr. 385, 482–83;

neither location was air conditioned, *see* IHO Tr. 174, 385, which could make it harder to focus,

*see* IHO Tr. 385–86.  Similarly, speech/language therapy was provided in an office with two

other people.  *See* IHO Tr. 380.  Notably, three of the IEP's 17 goals concerned occupational

therapy, and (at least) four more concerned speech and language skills.  *See* DOE Ex. 3, at 9–13.

44

This factor thus also supports the Parents' critique.  A number of courts have held that, when a proposed placement has not been proven able to deliver the services required by the IEP, that alone constitutes the denial of a FAPE.  *See, e.g.*, *B.R.*, 910 F. Supp. 2d at 678–79 (finding denial of FAPE where DOE "failed to carry its burden of showing that K.O. would receive the 1:1 out-of-class occupational therapy set forth in the IEP"); *D.C.*, 950 F. Supp. 2d at 513 ("At the time D.C. was considering placement at P188, the record indicates that the school could not provide a seafood free environment," as required by IEP); *see generally M.O.*, 793 F.3d at 244.

Third, the school environment at P.S. 169 appears to have been loud and problematic in other ways for LB.  The IEP emphasized the importance of quiet for LB and his difficulty adapting to loud noise:  "In calm, quiet environments, L[B] is relaxed and will easily engage with adults.  However, when in proximity to a loud peer, especially if the child is crying or upset, L[B] may become dysregulated.  When dysregulated, he will cover his ears and may scream.  In some situations, he may attempt to squeeze or scratch at a trusted adult or the upset child."  DOE Ex. 3, at 4.  The IEP also noted that LB needed "access to a quiet space."  *Id.*  Consistent with this, Dr. Pape testified that LB needed a "quiet, structured environment"—not one where the students "are running all over the halls and screaming."  IHO Tr. 57.  The characteristics of P.S. 169 were incompatible with this identified need.  The school had an intercom system and school bells.  *See, e.g.*, IHO Tr. 126–27.  The record—including the IEP—suggests that this may have frequently distressed LB.  *See, e.g.*, IHO Tr. 490–91 ("[A]ny sort of sudden loud noise scares him and can make him cry."); Parents Ex. L2 ("[H]e is sensitive to unpredictable loud noises."); IHO Tr. 373 ("He also is greatly affected by visual and auditory stimulus."); *accord* DOE Ex. 8, at 6; DOE Ex. 6, at 1.  It also suggests that the general environment at P.S. 169 was otherwise loud.  Specifically, while Ms. Velasquez was testifying from her office, she explained why the

other hearing participants were hearing background noise through the phone: "I work in a District 75 school. I'm in my office and there are children screaming outside my door." IHO Tr. 188–89. This is precisely the type of environment that Dr. Pape sought to avoid for LB. *See* IHO Tr. 57.[13]

Unlike the Parents' first three claims of inherent deficiencies—which overwhelmingly have been shown, and do not require the Court to draw conclusions in sensitive educational areas—the record is more mixed as to the Parents' fourth claim. The Parents doubt whether P.S. 169 had appropriate facilities and sensory equipment to help LB maintain sensory regulation, or to regain calm after becoming dysregulated. There is no question that (1) P.S. 169 had at least some sensory equipment (*e.g.*, a mat and ball, *see* IHO Tr. 484), but that (2) the Rebecca School had far more, and more immediately accessible, equipment, *see, e.g.*, IHO Tr. 374. But the Rebecca School's offerings do not set the benchmark for evaluating whether another school's offerings are adequate. This Court is ill-positioned to make, in the first instance, the expert judgment required to resolve this claim of a deficiency.

It is, however, unnecessary to reach this fourth claim, to resolve the Parents' argument that P.S. 169 was inappropriate. Viewed in combination, the first three deficiencies noted by the Parents and found by the Court leave little doubt that P.S. 169 was ill-suited because it could not have implemented LB's IEP. Because the DOE proposed a placement that could not have implemented LB's IEP, the DOE denied LB a FAPE. *See, e.g.*, *M.O.*, 793 F.3d at 245; *B.R.*, 910 F. Supp. 2d at 678–79; *D.C.*, 950 F. Supp. 2d at 513.

---

[13] Ms. Silverman acknowledged that the noise situation at P.S. 169 caused "a couple of students" whom she felt were "similar" to LB to "cover their ears" in response to intercom announcements, the ringing of the school bell, or crying peers. *See* IHO Tr. 126–27.

46

**C.     The Parents' Placement Was Appropriate and the Equities Favor Them**

**1.     The Rebecca School was appropriate**

Having found two violations of the IDEA, one procedural and one substantive, the Court

addresses step two of the *Burlington–Carter* test: whether the private school placement the

Parents chose was appropriate to the student's needs.  *See, e.g.*, *Frank G.*, 459 F.3d at 363–64.

Under New York law, the burden of proof is on the parents to show that their unilateral

private placement was appropriate.  *A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York*,

690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010) (citing *Schaffer*, 546 U.S. at 58; N.Y. Educ. L.

§ 4404(1)(c)).  The Second Circuit has explained that the appropriateness of the parents' choice

turns on whether it "is reasonably calculated to enable the child to receive educational benefits."

*Gagliardo*, 489 F.3d at 112 (citation omitted).  A private placement meeting this standard is "one

that is 'likely to produce progress, not regression.'"  *Id.* (quoting *Walczak*, 142 F.3d at 130).  The

parents' choice must be "appropriate," "not . . . perfect."  *Frank G.*, 459 F.3d at 364 (citation

omitted).  An appropriate private placement "need not meet state education standards or

requirements."  *Id.* (citing *Carter*, 510 U.S. at 14).  Ultimately, the standard to be applied is to

determine whether "[the] unilateral private placement . . . provides educational instruction

*specially* designed to meet the *unique* needs of a handicapped child, supported by such services

as are necessary to permit the child to benefit from instruction."  *Gagliardo*, 489 F.3d at 115

(citation omitted) (emphasis added).

In both of his decisions, the SRO declined to reach the second and third prongs of the

*Burlington–Carter* test.  *See* SRO 2011 Dec. 19; SRO 2014 Dec. 19.  The IHO, however,

addressed both issues.  *See* IHO Dec. 6–9.  "[T]he courts should defer to the IHO's analysis

when considering an issue not reached by the SRO."  *C.F.*, 746 F.3d at 77 (citing *M.H.*, 685 F.3d

at 252); *see also S.B. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 0349 (SAS), 2015 WL 3919116, at

*4 (S.D.N.Y. June 25, 2015).

As to the appropriateness of the Rebecca School, the IHO first reviewed the governing

legal standards, *see id.* 6–8, and, applying them, found that the Rebecca School was appropriate,

because it provided LB "with educational instruction specially designed to meet his unique

needs, supported by such services as were necessary to permit L.B. to benefit from instruction,"

*id.* at 8.   The IHO noted that, at the hearing, Tina McCourt, the Rebecca School's program

director, had testified that LB is in a 8:1:3 class at the school, where he also receives a host of

related services, including speech and language therapy, occupational therapy, physical therapy,

and adaptive therapy.   *Id.* at 8.   The IHO also noted that the Rebecca School uses the

DIR/Floortime teaching methodology.   *Id.*   The IHO further found that "the program at [the

Rebecca School] is a therapeutic environment that is designed to address LB's sensory and social

deficits," and had produced the desired results:  LB's periods of dysregulation decreased in

frequency, his speech and language skills improved, his social skills developed, and his

vocabulary increased.   *Id.* at 8–9 (citing Parents Exs. 13, 14, 17).   The IHO therefore concluded

that the program at the Rebecca School was appropriate for LB because it addressed his

"educational and social/emotional benefits and because LB has derived a meaningful educational

benefit during the 2010–2011 school year."   *Id.* at 9.

The IHO's findings merit deference.   They are well-reasoned and extremely well-

supported by the record.   The testimony and evidence the Parents offered at the due process

hearing demonstrated that the Rebecca School provided an education well-attuned to LB's

particular strengths, deficits, and abilities with respect to both his academic and therapeutic

needs.  And the school regularly conducted detailed individualized assessments, which reveal a clear awareness and assessment of LB's skills and needs.

These assessments, conducted twice each year, were comprehensive:  They described LB's state of progress in speech/language, comprehension, word recognition, math, social studies, science, independent living, motor planning, self-regulation, physical balance and strength, art, and music.  They then provided several pages of goals.  *See* Parents Exs. M–O.  The Rebecca School regularly adjusted LB's curricular goals in light of his performance and conduct. *See* Parents Exs. M–O.  The school's assessments also reveal meaningful progress by LB across various areas.  For example, a comparison of LB's December 2009 and May 2010 assessments shows that, by May 2010, he had increased word-recognition skills, improved comprehension, better math skills, a greater attention span, a more developed ability to communicate, and greater interest in, and interaction with, his peers.  *See, e.g.*, Parents Ex. M.  Significantly, the Rebecca School's assessments reveal that LB's periods of dysregulation had decreased in both frequency and duration, and that he had improved his ability to *self*-regulate.  *Id.*

Finally, the Second Circuit has noted that evidence of *actual* progress is "relevant to the court's review," but by no means dispositive in "demonstrat[ing] that a private placement was appropriate."  *Gagliardo*, 489 F.3d at 115; *see also A.D.*, 690 F. Supp. 2d at 212.  Here, there is evidence of LB's actual progress during the 2010–2011 school year.  As the IHO noted, Tina McCourt, the Rebecca School's program director, explained how—just as LB made progress at the school before the 2010–2011 school year—he continued to make progress in all areas during that school year.  *See, e.g.*, IHO Tr. 255 (progress in self-regulation); IHO Tr. 255 (decrease in frequency and duration of LB's episodes of dysregulation); IHO Tr. 258 (speech and language skills: "We're seeing more consistent longer words in his utterances, and much more

spontaneous speech, not the scripting"); IHO Tr. 258 (comprehension: "we've also seen an increase in his ability to answer why questions"); IHO Tr. 259 (motor planning: "we've definitely seen improvement in [h]is sequencing and motor planning"); IHO Tr. 259, 271–73 (independence in daily life tasks such as ascending stairs, feeding himself, teeth brushing, and hand-washing); IHO Tr. 262–63 (social skills); IHO Tr. 267–68 (handwriting skills); IHO Tr. 268–69 (math skills, including addition and "[t]he concepts of bigger and smaller"); IHO Tr. 264–65 (decreased anxiety); IHO Tr. 291 ("He's made progress in all areas of development.").

The DOE doubts the appropriateness of the Rebecca School.  It notes that LB had not made as much progress at the school as the DOE had hoped, that the school's environment could be loud and chaotic, and that it was unclear precisely how much counseling LB had received at the school.  *See* DOE Reply Br. 19–20 (citing IHO Tr. 34–35, 59–61).  As an initial matter, the DOE's arguments are primarily based on the testimony of Dr. Pape—a DOE witness at the hearing.  *See* IHO Tr. 34–35, 57–59.  The IHO heard her testimony but, at least as to these points, appears not to have given it significant weight.  An independent review of the record suggests several possible reasons why:  (1) that the DOE wished that LB had "ma[d]e a little bit more progress" is not the legal test of appropriateness, *see* IHO Tr. 34–35; (2) LB's progress at the Rebecca School was evident, notwithstanding Dr. Pape's views as to the propriety of the sound volume in the classroom, *see supra*; (3) Ms. McCourt testified that LB did receive counseling during summer 2010, *see* IHO Tr. 324; and, most broadly (4) programs are to be considered in their totality and need not strictly adhere to every detail in an IEP to merit a finding of appropriateness.[14]

---

[14] *See, e.g.*, *Frank G.*, 459 F.3d at 365 ("[P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential."); *A.R. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 4493 (PAC), 2013 WL 5312537, at *6 (S.D.N.Y. Sept. 23, 2013)

In sum, the record strongly supports the IHO's conclusions that the Rebecca School provided educational instruction and related services that were both "specifically designed" to meet LB's "unique needs"—and that, in fact, LB progressed during the 2010–2011 school year. *Gagliardo*, 489 F.3d at 115 (citation omitted).  The Court therefore holds that the Parents' private placement at the Rebecca School was appropriate.

### 2.   The equities favor the Parents[15]

At the third, final step of the *Burlington–Carter* test, "courts are required to evaluate the equities in considering a tuition reimbursement claim."  *M.H.*, 685 F.3d at 254 (citing *Carter*, 510 U.S. at 12); *see generally* 20 U.S.C. § 1415(i)(2) (authorizing court, where IDEA violation is found, to "grant such relief as the court determines is appropriate").  "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required.  Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."  *Carter*, 510 U.S. at 16; *see also J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F.

---

(rejecting DOE's argument that parents' private placement was not appropriate because that school's "related services" involved speech and language therapy twice a week, whereas DOE would have provided such services three times per week); *G.R. v. N.Y.C. Dep't of Educ.*, No. 07 Civ. 4711 (TPG), 2009 WL 2432369, at *3 (S.D.N.Y. Aug. 7, 2009) ("[P]laintiff was not required to establish that WPS [the unilateral private placement] offered speech and language therapy in order to prevail.  Rather, when the WPS program and R.R.'s deficiencies are examined in their totalities, it is clear that the program was well designed to serve R.R.'s needs.").

[15] In its two briefs, the DOE does not address the equities—it does not mention them at all—even though both of the Parents' briefs address this subject.  *See* Pl. SJ Br. 33–35; Pl. Opp. Br. 1, 3, 5. The DOE may therefore be implicitly conceding this point.  But, given the absence of an express concession by the DOE on this point, the Court addresses this issue.

Supp. 2d 635, 671 (S.D.N.Y. 2011) ("[T]his Court has broad discretion to consider the range of all relevant facts in determining whether and to what extent awarding relief is equitable.").

Courts have considered a variety of factors at this step, including whether the parents cooperated with the CSE (*e.g.*, providing reports, attending the meeting, participating in the meeting), *M.H.*, 685 F.3d at 254; whether the parents timely notified the school district of their intent to place their child in a private school, *see, e.g.*, *Frank G.*, 459 F.3d at 376; whether the parents visited the DOE's proposed placement, *see, e.g.*, *Mr. & Mrs. A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 419 (S.D.N.Y. 2011); whether the parents intended to genuinely consider a proposed public placement, or whether they would have kept their child in private school regardless of the proposed public placement, *see, e.g.*, *Carmel Cent. Sch. Dist. v. V.P.*, 373 F. Supp. 2d 402, 418 (S.D.N.Y. 2005); whether the parents or the DOE unreasonably delayed, *see id.* at 416; and the appropriateness of the DOE's conduct (for example, in one case, the court found that the DOE had "consistently stonewalled M.H.'s inquiries into the appropriateness" of the school, *M.H.*, 685 F.3d at 254 (citation omitted)).

Here too, while the SRO did not reach this aspect of the *Burlington–Carter* test, the IHO found that the equities favor the Parents and awarded them a full tuition reimbursement.  *See* IHO Dec. 9.  The IHO specifically noted that: the Parents cooperated with the CSE; the Parents timely notified the DOE (in their June 16, 2010 letter) that they were placing LB at the Rebecca School for the 2010–2011 school year; although the Parents rejected the IEP on June 16, 2010, they did so only because they had yet to receive a proposed placement; the DOE did not explain why, after generating the IEP in February, it nevertheless "waited until June 15, 2010 to send the parents the notice of proposed placement"; the Parents promptly visited P.S. 169 and timely rejected it by letter; and the DOE did not respond to that letter.  *Id.*

The IHO's opinion is persuasive and merits deference. *C.F.*, 746 F.3d at 77. Indeed, given the record, the IHO's bottom-line assessment of the equities is unavoidably correct. All of the aforementioned considerations that courts have weighed favor the Parents in this case. The Parents cooperated with the DOE at all times; they allowed the DOE to conduct evaluations and observations of LB, *see* Def. Counter Statement, ¶ 63; they attended and participated in the CSE meeting; they consistently acted in a way that bespoke genuine consideration of any proposed public placement, such as repeatedly writing letters seeking information about teaching methodologies, immediately contacting the DOE and P.S. 169 to schedule a visit, and regularly calling Ms. Velasquez until they were able to coordinate a visit; they visited the DOE's proposed placement; they provided timely notice of their intent to privately place LB; and, more generally, the Parents consistently acted reasonably and promptly. By contrast, the DOE ignored several reasonable and timely requests for information from the Parents; failed to provide a proposed placement until the 11th hour; failed to schedule a school visit until after the start of the new school year; and throughout lacked any sense of urgency even though its delays had created a quite urgent situation for LB.

Under these circumstances, the equities overwhelmingly favor the Parents. *See, e.g.*, *M.H.*, 685 F.3d at 254 (ruling for parents where, *inter alia*, the DOE "consistently stonewalled M.H.'s inquiries into the appropriateness" of the school) (citation omitted); *C.U.*, 23 F. Supp. 3d at 233 ("[T]he Parents acted diligently and were cooperative. It was the DOE that was unresponsive to the Parents' repeated inquiries. In such circumstances, equity does not favor the DOE."); *Mr. & Mrs. A.*, 769 F. Supp. 2d at 419 (tuition reimbursement warranted where parents cooperated with district, "participated at the CSE meeting," "visited proposed placements," and gave district timely notice before re-enrolling student in private school).

## CONCLUSION

For the foregoing reasons, the Court grants the Parents' motion for summary judgment, orders the DOE to fully reimburse the Parents for the cost of tuition at the Rebecca School for 2010–2011 (*i.e.*, $92,100), and denies the DOE's cross-motion for summary judgment.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 17 and 20, and to close this case.


SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: September 21, 2015
New York, New York

54